UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:15-CV-249-TBR


MICHAEL COOPER,                                                                                PLAINTIFF

v.

SOJNIA BOWER, et. al.,                                                                        DEFENDANT


## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendants' Motion for Summary Judgment and Motion for Leave to exceed the page limitation on the same. [DN 137.] Plaintiff Michael Cooper ("Plaintiff") has responded. [DN 151.] The time for Defendants to file a reply has passed. This matter is now ripe for adjudication. For the following reasons, Defendants' Motion for Leave to exceed the page limitation is **GRANTED**, and Defendants' Motion for Summary Judgment [DN 137] is **GRANTED in part and DENIED in part.**

## I. BACKGROUND

This is a 42 U.S.C. § 1983 civil rights action arising out of a string of incidents that have allegedly occurred while Plaintiff has been in the custody of the Kentucky Department of Corrections ("KY-DOC") while incarcerated at the Kentucky State Penitentiary ("KSP") in Eddyville, Kentucky. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Plaintiff has named different Defendants in different filings with the Court, but in Defendant's instant Motion for Summary Judgment, nineteen Defendants are named. They are James Beavers, Troy Belt, Sojnia Bower, Jesse Coombs, Larry Cranor, Tami Bauer (née Darnell), Bruce Von Dwingelo, Cody Edmonds, Lucas Fraliex, Lisa Gibbs, Skyla Grief, Timothy Hawkins, Danny Heggen, George Henson, Mitchell McLeod, Joy Myers, Marshall Peek, Jill

Robertson, and Randy White. Hereinafter, they will be referred to by their last names or, collectively, "Defendants."

Plaintiff has brought a total of six different claims against the above nineteen Defendants: (1) retaliation, (2) excessive use of force in violation of the Eighth Amendment, (3) Fourth Amendment violations of the right to bodily privacy, (4) a state law conversion claim, (5) violations of his First Amendment Free Exercise Clause and Fourteenth Amendment Due Process and Equal Protection rights, and (6) interference with his legal mail.

## II. LEGAL STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When examining whether a motion for summary judgment should be granted, the court is required to resolve all ambiguities and draw all reasonable inferences against the movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "not every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). Rather, the question is whether the party who bears the burden of proof in the case has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). This means that the plaintiff must present to the court more than a mere scintilla of evidence supporting her position. *Id.* Indeed, the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *Id.*

It is not enough for a plaintiff to present speculation as to elements of the case, because "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist

to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, it should be noted that "'a verified complaint…satisfies the burden of the nonmovant to respond' to a motion for summary judgment, unlike 'mere allegations or denials' in unverified pleadings." *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999) (en banc).

### III. DISCUSSION

### A. First Amendment Retaliation Claims

Plaintiff has brought retaliation claims against fifteen of the nineteen Defendants named above. These claims arise largely out of what Plaintiff contends was retaliation for Plaintiff filing grievances because of various incidents that have occurred since Plaintiff began his term of imprisonment at KSP, and for Plaintiff filing the instant lawsuit. Retaliation stemming from an inmate's exercise of his constitutional rights violates the Constitution. *Thaddeus-X*, 175 F.3d at 394. In stating a claim for First Amendment retaliation, the plaintiff must establish that: (1) he was "engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Id.* Typically, "the question of whether an alleged retaliatory action poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). "[U]nless the claimed retaliatory action is truly inconsequential, the plaintiff's claim should go to the jury." *Id.*

**1. Sojnia Bower.** The retaliation claim against Defendant Bower concerns an alleged incident in Plaintiff's unit wherein, in retaliation for Plaintiff filing a grievance against Bower, she began "pushing trash over the rail and hitting [his] door to wake him up." Plaintiff further avers in his Verified Complaint that Bower told him, "I got you now." Later, Plaintiff avers that on December 28, 2015, he received a write-up from Bower for inappropriate sexual behavior as retaliation for filing the present action against her.

Prisoners have a right to file grievances under the First Amendment. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). Thus, Plaintiff's conduct in the instant case was protected. The second question is whether Bower's actions would deter a person of ordinary firmness from continuing to file grievances. "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." *Thaddeus-X*, 175 F.3d at 398. The standard is an objective one, which assists courts in tailoring the test "to the different circumstances in which retaliation claims arise," thus making it "capable of screening the most trivial of actions from constitutional cognizance." *Id. See also Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) (explaining that "it would trivialize the First Amendment to allow plaintiffs to bring First Amendment retaliation claims for *any* adverse action no matter how minor."). Plaintiff's claim, even when taken as true, fails to meet the "threshold…intended to weed out…inconsequential actions." *Thaddeus-X*, 175 F.3d at 398. As such, summary judgment for Bower is appropriate on this issue. It hardly follows that, because an inmate was awoken one time by a correctional officer assigned to his cell unit, and because of the singular phrase "I got you now," a person of ordinary firmness would be deterred from continuing to file grievances, which is precisely what Plaintiff continued to do. *See*

*Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989) (holding that police officer's statement that "I am going to get you" was "not actionable under section 1983.").

The second issue Plaintiff raises in his retaliation claim against Bower is the write-up he received for inappropriate sexual behavior. Here, Plaintiff's claim fails on the "causal connection" prong. As explained in *Smith v. Campbell*, 250 F.3d at 1038, "[u]nder the causation element of a prisoner's *prima facie* case for retaliation, the subjective motivation of the decisionmaker is at issue—that is, the plaintiff must show that the decision was motivated, at least in part, by the plaintiff's protected activity," here, filing a grievance against Bower. "Once the plaintiff has met this burden, if the defendant can show that the same action would have been taken in the absence of protected activity, the defendant is entitled to prevail on summary judgment." *Id.* "[A] proven infraction of prison rules will generally satisfy the defendant's burden." *Thomas v. Eby*, 481 F.3d 434, 442 (6th Cir. 2007). The inappropriate sexual behavior for which Plaintiff was written up was masturbating at his cell door, actions Bower personally observed. [*See* DN 137-19, at 1.] Additionally, the committee's report from the hearing at which Plaintiff was found guilty noted that Plaintiff's defense was only that Bower had not previously written him up for the same inappropriate sexual behavior. And the conduct of which Plaintiff was found guilty violates KSP rules, as shown from the committee hearing disciplining him. In his Response, Plaintiff does not refute Defendants' arguments on this point and, indeed, does not mention the incident or Bower at all. Because this claim fails as a matter of law, summary judgment is appropriate and the Court need not address the issue of whether Bower is entitled to qualified immunity on this issue.

**2. Skyla Grief.** Plaintiff avers that Defendant Grief threatened to have him transferred to a more restrictive cell unit if Plaintiff did not cease filing grievances and that Belt instructed

Plaintiff that Grief had ultimately put Plaintiff in the more restrictive unit to "teach him a lesson." Plaintiff avers that Grief put a "keep away," or "conflict" on Plaintiff and another inmate, Garfield Evans, because Plaintiff was helping Evans with his legal issues. Lastly, Plaintiff avers that Grief instructed him that if he did not "stop writing letters to Frankfort," she would send "[Evans] to Eastern and strip me [Plaintiff] out and let me rot in 3 cell house."

Plaintiff has established that he was engaged in protected conduct: filing grievances. *See Smith*, 250 F.3d at 1037. Additionally, Plaintiff's averment that he was threatened with a transfer to a more restrictive cell unit, and was ultimately transferred there, would certainly constitute an adverse action. *See Thaddeus-X*, 175 F.3d at 396 ("In the prison context, an action comparable to transfer to administrative segregation would certainly be adverse."). Defendants argue that inmates do not possess the right to be housed in the unit or classification of their choice. *See Olim v. Wakinekona*, 461 U.S. 238, 245-46 (1983). And while Defendants are correct on this front, they do not adequately address the issue of the *reason* for Plaintiff's transfer to a more restrictive unit. Certainly, KSP administrators and the individuals responsible for inmate transfers have the right to transfer prisoners, when warranted in their judgment, to more restrictive units. The issue, however, is the sufficiency of the reason, and whether Plaintiff was transferred because of behavior and infractions or because of his protected conduct. This dispute as to Grief's motives for threatening to have Plaintiff transferred indicates to the Court that a genuine dispute as to a material fact remains, rendering summary judgment inappropriate at this time. *See Hill v. Lappin*, 630 F.3d 468, 474-75 (6th Cir. 2010) (explaining that the threat of transfer to a more restrictive environment can constitute adverse action).

**3. Timothy Hawkins.** Plaintiff avers he suffered retaliation from Defendant Hawkins when Hawkins fired Plaintiff from his "Walkman Job" and took pens and grievance forms from

Plaintiff's cell. Further, Plaintiff avers that Hawkins instructed him that he would "rot" in the restrictive unit of KSP if he did not drop the lawsuit against Bower and the grievances he had already filed. An inmate's involvement in a lawsuit is protected conduct. *See Zamiara*, 150 F. App'x at 491. Additionally, drawing all reasonable inferences against the movant, the Court finds that Hawkins took adverse action against Plaintiff. It is true that "removing Plaintiff from his prison job is not an 'adverse action' under the retaliation standard." *Diamond v. Jackson*, 2016 WL 411112, No. 5:15-cv-P164-GNS, at *4 (W.D. Ky. Feb. 2, 2016) (citing *Bailey v. Ingram*, 2014 WL 5431300, No. 5:14-279-DCR, at *13 (E.D. Ky. Oct. 24, 2014)). Moreover, while Hawkins avers that he is not normally involved in cell searches and does not recall searching Plaintiff's cell, removing pens and forms from Plaintiff's cell does not rise to the level of action necessary for Plaintiff to sustain a retaliation claim against him. However, the Sixth Circuit has noted that a threat of transfer "to a living environment with more restrictions and fewer privileges than in the prison's general population" can rise to the level of adverse action. *See Hill*, 630 F.3d at 474-75. Thus, while some of Hawkins' actions do not rise to the level of implicating the "adverse action" standard, the threat about which Plaintiff avers regarding him being left to "rot" in a restrictive unit of KSP is sufficient to constitute an adverse action. Summary judgment in favor of Hawkins would be inappropriate at this time.

**4. Joy Myers & Jill Robertson.** Plaintiff avers that Defendants Myers and Robertson worked in concert with Defendant Grief in order to keep Plaintiff and Evans away from each other due to the fact that Plaintiff was assisting Evans with his legal issues. Plaintiff avers that this was done in retaliation for him filing grievances and a lawsuit. The Court is persuaded by Defendants' argument regarding the "adverse action" and "causal connection" prongs of Plaintiff's retaliation claim. Specifically, as laid out in detail above, the adverse action taken by

officials must be such that it "would deter a person of ordinary firmness from engaging in that conduct." *Thaddeus-X*, 175 F.3d at 394. Here, the only adverse action about which Plaintiff complains is being separated from another inmate, Garfield Evans. It stretches credulity to believe that moving an inmate from one unit of a prison to another would deter a person of ordinary firmness from engaging in protected activity like filing a grievance. Moreover, as the Supreme Court noted in *Overton v. Bazzetta*, 539 U.S. 126, 131-32 (2003), prisoners' First Amendment right of freedom of association is curtailed during incarceration. Plaintiff may have wanted Evans to remain closer to him, but he has no right to this, nor does the separation of these two inmates give rise to a cognizable retaliation claim.

Moreover, there does not appear to be a causal connection between Plaintiff filing grievances against individuals like Bower and the inmate transfer which was effectuated. Defendants have proffered substantial evidence that the transfer was made not because Plaintiff had filed a grievance or grievances, but rather, because Plaintiff had been caught on KSP's security cameras engaging in a sexual act with Evans. This conduct was what apparently initiated the 2014 adjustment committee issue wherein Plaintiff contends that Defendant Bauer "trumped up" a lie about the sexual act in question. Exhibit F to Defendants' instant Motion directly refutes any claims that Bauer lied, and tends to show exactly why Plaintiff was distanced from Evans in the first place. Additionally, this Court is reluctant to interfere with prison officials' inherent flexibility with respect to "fine-tuning…the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. 472, 482-83 (1995) (explaining that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment."). This being the only claim for retaliation that Plaintiff has made against Myers and Robertson, the Court finds that summary judgment in favor of Myers and Robertson is appropriate on this issue.

Because this claim fails as a matter of law, the Court need not address the issue of whether Myers and Robertson are entitled to qualified immunity.

**5. Troy Belt.** Regarding Defendant Belt, Plaintiff avers that on December 13, 2013, Belt stood by and watched while another inmate, "Kasey Kazee," assaulted Plaintiff. Later, Plaintiff avers that Belt told him, "see what happens when you file grievances on staff." Plaintiff further avers that, after the assault, Kazee was given a job and money was placed in his inmate account. Plaintiff also avers that Belt retaliated against him by putting a "keep away," or "conflict" on Plaintiff and another inmate, Garfield Evans, in response to Plaintiff providing legal assistance to Evans. Plaintiff avers that Belt also instructed another inmate to file a "confidential report" against Plaintiff and Evans. Lastly, Plaintiff avers that Belt assigned him to a stricter cell unit in retaliation for filing grievances.

Plaintiff has established that he was engaged in protected conduct: filing grievances. *See Smith*, 250 F.3d at 1037. The next question is whether Belt took adverse action against Plaintiff. As explained above, Defendants have presented sufficient evidence regarding the separation of Plaintiff and Evans as necessary under PREA and KSP policies to satisfy this Court. However, transfer to a more restrictive unit is adverse action under the retaliation inquiry. Where Plaintiff's transfer fails to establish a cognizable claim for retaliation is at the causal connection prong. This is because, while Plaintiff avers in his Verified Complaint that he was transferred due to the grievances he had been filing, Defendants have successfully carried their burden of showing that Plaintiff would have been transferred anyway. *See Eby*, 481 F.3d at 441-42. The transfer that Plaintiff avers was retaliatory came on the heels of the well-documented incident during which Plaintiff had to be restrained by a use of force team and shot with pepper balls in August 2014. [DN 137-6.] It was after this incident that Plaintiff was transferred to the more restrictive unit.

Thus, Defendants have carried their burden of showing that, absent any retaliatory intentions, Plaintiff would have been transferred anyway.

The remaining adverse action Plaintiff complains of with respect to Belt is when Belt allegedly permitted another inmate to assault Plaintiff and convinced another inmate to file a confidential report against Plaintiff. Belt avers that he took no adverse action with respect to the assault Plaintiff suffered. Specifically, Defendants have proffered evidence that Belt was in no way involved with this assault. Kazee was found guilty of striking Plaintiff multiple times on December 22, 2013 at 8:26 AM. [DN 137-5, at 1.] According to Belt's timesheet, he did not clock into work until 2:38 PM that afternoon, [DN 137-34], and thus, he argues that he could not have stood by while this incident occurred. However, Plaintiff avers in his Verified Complaint that Belt was present and looked on while the assault occurred, and then made retaliatory remarks to him. Drawing all reasonable inferences against the movant, Plaintiff's averments, if true, present to the Court adverse action taken against Plaintiff by Belt, and a causal connection between that action and Plaintiff's protected activity. This is sufficient to create a genuine dispute as to a material fact, precluding summary judgment at this time.

**6. Tami Bauer (née Darnell).** Plaintiff avers that during his proceedings before the adjustment committee regarding the "false report" made about him being involved in a sexual act with another inmate, Defendant Bauer "trumped up the statement I made to convict me [Plaintiff.]" The Court finds that summary judgment on this claim as to Bauer is appropriate. Specifically, the only averment Plaintiff has made against Bauer is that she "trumped up," presumably meaning that she lied, regarding Plaintiff's having committed a sexual act with another inmate. However, Defendants have presented sufficient evidence to refute any claims that Bauer lied. Indeed, attached to Defendants' instant Motion at Exhibit F is a recording of the

incident involving Plaintiff, directly contradicting any claim Plaintiff has made and removing any genuine issue of material fact as to Bauer. Because this claim fails as a matter of law, summary judgment is appropriate and the Court need not address the issue of whether Bauer is entitled to qualified immunity.

**7. Lucas Fraliex.** Plaintiff avers that Defendant Fraliex shook down Plaintiff's cell for 45 minutes and took Plaintiff's legal books. Further, Plaintiff claims that Fraliex threatened Plaintiff about filing grievances, and told him to drop the lawsuit against Bower. The protected activity in which Plaintiff was engaged at this juncture was this lawsuit. As explained in *Thaddeus-X*, 175 F.3d at 391, "[i]t is well established that prisoners have a constitutional right of access to the courts." *See also King v. Zamiara*, 150 F. App'x 495, 491 (6th Cir. 2005) (explaining that an inmate was engaged in protected activity under the First Amendment by participating in a lawsuit.).

While Defendants deny that any of Fraliex's actions were taken in retaliation for Plaintiff having filed this lawsuit, Plaintiff's contentions directly refute that. Fraliex's affidavit explains that he has participated in multiple cell searches of Plaintiff's cell. And while his affidavit further states that he complied with KSP policies at all times, Plaintiff's Verified Complaint avers that Fraliex expressly told him to drop the lawsuit against Bower and also took legal work from Plaintiff's cell. These threats and the theft, if true, would likely deter an individual of ordinary firmness from pursuing the lawsuit against Bower. Lastly, Plaintiff's assertion that Fraliex actually told him that the "shakedown" of his cell was *because of* the fact that Plaintiff had filed a lawsuit against Bower is, if true, sufficient to show a causal connection between the protected activity and the adverse action. While Defendants deny Plaintiff's version of events, this dispute

goes to material facts, indicating to the Court that summary judgment would not be appropriate on this claim.

**8. Jesse Coombs & Cody Edmonds.** Plaintiff avers that Defendants Coombs and Edmonds retaliated against him after they learned that Plaintiff had filed a lawsuit against Bower. Plaintiff avers that Coombs became "aggressive" with Plaintiff and yelled and cursed at him, and that Edmonds grabbed Plaintiff by the arm for 45 minutes to an hour and told him to drop the lawsuit against Bower. Further, Plaintiff avers that Coombs "trashed" Plaintiff's personal property and legal books and has shaken down Plaintiff's cell on five occasions, during which time Coombs allegedly told Plaintiff to drop the lawsuit or the shake downs would continue to happen. Next, Plaintiff avers that Coombs threw away legal books, legal documents, grievances, photographs of Plaintiff's daughter and grandfather, and letters from his family. Lastly, Plaintiff avers that Coombs "planted a knife on [him] and said he found it on me [Plaintiff.]" Again, Plaintiff was engaged in protected conduct with respect to this lawsuit. Further, the repetitious nature of the cell shakedowns about which Plaintiff avers in his Verified Complaint, coupled with the threats and intimidation Plaintiff received at the hands of Coombs and Edmonds leads this Court to conclude that a genuine issue of material fact exists. Specifically, while Coombs and Edmonds deny any wrongdoing when conducting these cell searches, Plaintiff's averments directly contradict their motives. And construing Plaintiff's averments in a most favorable light, it follows that the requisite causal connection is also present between his protected conduct and the adverse actions taken by Coombs and Edmonds. Summary judgment would not be appropriate at this time on this issue.

**9. George Henson, Mitchell McLeod & Danny Heggen.** Plaintiff avers that he suffered retaliation from Defendants Henson, Heggen and McLeod when they refused to allow Plaintiff to

use the phone to call his family and when Henson allegedly spit in Plaintiff's food. Further, Plaintiff avers that Henson came into Plaintiff's cell on August 16, 2014 with Defendants Heggen and McLeod and threw away Plaintiff's legal work, legal books, personal pictures, and letters due to the fact that Plaintiff had sought legal redress.

Again, Plaintiff was engaged in protected conduct with respect to this lawsuit. Further, the nature of the cell shakedowns about which Plaintiff avers in his Verified Complaint, coupled with the threats and intimidation Plaintiff allegedly received at the hands of Henson, McLeod and Heggen, leads this Court to conclude that a genuine issue of material fact exists. Specifically, while these three Defendants deny any wrongdoing when conducting these cell searches, Plaintiff's averments directly contradict their motives. And if Plaintiff's averments are viewed in a light most favorable to him, then the requisite causal connection is also present between his protected conduct and the adverse actions taken by them. Summary judgment would not be appropriate at this time on this issue.

**10. Larry Cranor & Bruce Von Dwingelo.** Plaintiff avers in conclusory fashion that Defendant Von Dwingelo was party to the cell unit transfer wherein Plaintiff was transferred to a stricter unit to "teach him a lesson." Additionally, Plaintiff avers that Von Dwingelo, at the instruction of Cranor and Belt, took Plaintiff's clothes, mattress, and property and left him in his new cell with nothing but his underwear.[1] Defendants' instant Motion includes the KY-DOC Disciplinary Report Form from August 15, 2014, detailing the incident involving Plaintiff: "Inmate Michael Cooper…[ignored] several direct orders to return to his cell after being argumentative with staff. Inmate Cooper refused to return to his cell and had to be shot with the

---

[1] At the outset, it should be noted that Plaintiff references this event in his Second Amended Complaint, [DN 12], as occurring in 2014. Later, in his Third Amended Complaint, [DN 52], Plaintiff references extremely similar facts and implicating Von Dwingelo, but explains that it occurred on September 16, 2016.

pepper ball gun several times. Inmate Cooper still refused…[and a] Use of Force team had to enter the walk to restrain Inmate Cooper." [DN 137-6, at 1.]

The overwhelming evidence indicates to the Court that, even viewing the evidence in the light most favorable to Plaintiff, that Cranor and Von Dwingelo's actions were not taken in response to any protected activity on the part of Plaintiff. While Plaintiff avers that he was transferred into this strip cell, where there was no mattress, in retaliation for filing grievances, this singular conclusory statement cannot, without specific first-hand evidence establish a *genuine* dispute as to any material fact, nor can it overcome the convincing amount of evidence presented by Defendants that Plaintiff was relocated to this strip cell in response to his disruptiveness. To be sure, a "verified complaint…carries the same weight as would an affidavit for the purposes of summary judgment." *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008). However, where the verified complaint "does not set forth any specific facts" about the incident, but rather, alleges illegal acts "at a high level of generality," this could lead to a verified complaint not actually presenting any genuine dispute as to any material fact. *See Mourad v. Homeward Residential, Inc.*, 517 F. App'x 360 (6th Cir. 2013). Here, Plaintiff states that he "was sent to [the restrictive cell unit] due to me filing grievances…." [DN 12, at 6.] He does not explain why he thinks that, who told him that was the case, or how he has any first-hand knowledge of Defendants transferring him for that reason. *See Alpert v. United States*, 481 F.3d 404 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(e) (explaining that "an affidavit offered in opposition to summary judgment 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'").

Conversely, Defendants have explained in great detail Plaintiff's disruptiveness on the date in question, and have filed multiple affidavits and incident reports explaining the reasoning for Plaintiff's transfer to the more restrictive cell. Thus, even if Plaintiff's conclusory statement that he was transferred out of retaliation was in fact true, Defendants have also proffered an alternative reason indicating that he would have been transferred anyway. *See Eby*, 481 F.3d at 441-42 (explaining that, even "after a plaintiff shows that his protected conduct was a motivating factor in the defendant's action, the defendant may thwart the retaliation claim by showing that it would have taken the same action even without the protected activity."). Thus, Defendants have shown that Plaintiff's chronicled bad behavior would have resulted in his transfer to the restrictive unit anyway, and so his retaliation claim fails on the causation prong. Because the Court has determined that summary judgment is appropriate, the Court need not address the issue of whether Cranor and Von Dwingelo are entitled to qualified immunity on this claim.

**B. Excessive Use of Force**

Plaintiff has also alleged violations of the Eighth Amendment's prohibition of the excessive use of force against Defendants Belt, Coombs, and Edmonds.

"The Eighth Amendment prohibits the imposition of 'cruel and unusual punishments' upon prisoners." *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting U.S. Const. amend. VIII). Notably though, "not every shove or restraint gives rise to a constitutional violation." *Id.* This is because, "[o]n occasion, the maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law." *Id.* (internal quotation marks omitted). Correctional officers' conduct will constitute excessive use of force, and thus violate the Eighth Amendment, "when their offending conduct reflects an unnecessary and wanton infliction of pain." *Id.* However, the Supreme Court has

made it clear that punishment by correctional officers may contravene the Eighth Amendment as a cruel and unusual one even where "the inmate does not suffer serious injury." *Husdon v. McMillian*, 503 U.S. 1, 4 (1992).

Eighth Amendment claims involve both an objective component and a subjective component. *Id.* "First, the subjective component focuses on the state of mind of the prison officials," asking the question of "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (internal quotation marks and citations omitted). With respect to the second part of the Eighth Amendment inquiry, "the objective component requires the pain inflicted to be 'sufficiently serious.'" *Id.* (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)). The objective "component requires a contextual investigation, one that is responsive to contemporary standards of decency." *Id.* (internal quotation marks omitted). However, the seriousness of the injury to the inmate is not dispositive in this two-part analysis; rather, even where the inmate's injuries are not significant, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated…." *Id.* at 381.

When measuring if the force in question violated the Eighth Amendment, the court may consult various factors. For example, the court may examine the severity of the injury sustained by the inmate, whether there was a "need for application of force, the relationship between that need and the amount of forced used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (internal quotation marks omitted).

**1. Troy Belt.** Plaintiff avers that in August 2014, as he was being sent to another unit, an unnamed group of correctional officers tazed and beat Plaintiff in a "blind spot" where KSP's

security cameras cannot see. Plaintiff appears to aver that Belt was a part of this group, although he does not specifically state that Belt participated in the alleged incident. [DN 12, at 6.] In Belt's affidavit, he avers that he did, in fact, assist in transporting Plaintiff to his new cell unit and that this transfer was executed because, "following several direct orders from Lieutenant Larry Cranor" to Plaintiff instructing him to return to his cell, Plaintiff did not do so. According to Belt's affidavit, Plaintiff "was hit with pepper balls several times," and was tazed in an effort "to bring him under control, but he was not kicked, elbowed in the ribs, or hit on his back, shoulders, stomach, or legs," as Plaintiff avers he was in his second Amended Complaint. Likewise, Defendant Cranor's affidavit describes a similar scene: "A use of force team had to enter the walk to restrain Inmate Cooper. He was then taken to 7 cellhouse, where he was placed in a strip cell…." [DN 137-8, at 1.]

Defendants further argue that the extent of Plaintiff's injuries are *de minimis* and therefore cannot, as a matter of law, implicate the Eighth Amendment. Specifically, Defendants have attached as Exhibit HH to the instant Motion the KY-DOC Nursing Progress Notes from August 15, 2014. These notes provide the following: Plaintiff "was not happy when rec time was over and refused to go into his cell, his behavior continued to increase and eventually he was hit with pepper balls." The notes go on to provide that Plaintiff "has been transferred to 7CH [a new cell unit], upon inspection [Plaintiff] does have a swollen left ankle, and a scratched area to the left forearm. [Plaintiff] can put ice to the left ankle as needed. Will continue to monitor." [DN 146.]

Although Defendants argue strongly that Plaintiff's injuries were *de minimis* under the objective prong of the Eighth Amendment inquiry, this is not dispositive. Specifically, even where an injury to an inmate is minimal, it may still contravene the Eighth Amendment where it

was inflicted in a sadistic and malicious manner. *See Williams*, 631 F.3d at 381. And because Plaintiff's averments in his Verified Complaint and Belt's and Cranor's statements in their affidavits completely contradict each other on the material fact of the officers' purpose in applying force to Plaintiff's person, summary judgment in favor of Belt is not appropriate at this time.

**2. Jesse Coombs & Cody Edmonds.** In his First Amended Complaint, [DN 10], Plaintiff avers that, during an interior cell search conducted by Edmonds and Coombs, Coombs grabbed Plaintiff's arm and threatened him, telling him to drop his lawsuit or Plaintiff could expect unfavorable treatment moving forward. Plaintiff also avers that, during an interior cell search conducted by Edmonds and Coombs, Edmonds grabbed Plaintiff's arm for a period ranging from 45 minutes to an hour in an effort to intimidate Plaintiff and discourage him from filing grievances against KSP staff. Plaintiff refers to Edmonds' maneuver as a "vice grip," at times, but also simply as Edmonds grabbing his arm. In Edmonds' affidavit, attached to Defendants' instant Motion as Exhibit I, Edmonds avers that while he does not recall the exact date of the incident, nor the incident itself, he does recall "the substance of the interaction." Edmonds further avers that Plaintiff was being "combative, which was especially problematic given that someone could have fallen roughly ten feet from the upper walk [where Plaintiff's cell is located] to the floor below." While Edmonds does not recall grabbing Plaintiff's arm, he does aver that it could not have been for 45 minutes to an hour because routine cell searches do not take that long and that he "could not physically keep a vice grip on anyone for 45 minutes to an hour."

"Resolv[ing] all ambiguities and draw[ing] all reasonable inferences against the movant, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587, this Court concludes that summary judgment in

favor of Edmonds and Coombs would not be appropriate at this time. Objectively, a correctional officer holding an inmate's arm while another correctional officer conducts a search of the inmate's cell does not, by itself, rise to the level of cruelty required to implicate the Eighth Amendment's ban on cruel and unusual punishments. Irrespective of the minimal nature of the injury suffered by Plaintiff, the conflicting reports between Plaintiff and Defendants Coombs and Edmonds regarding the *purpose* of the interaction control this issue. While Coombs and Edmonds aver that it was done in the ordinary course of their jobs in order to keep themselves and Plaintiff safe, Plaintiff avers in his Verified Complaint that he was grabbed for an extended period of time in an effort by Coombs and Edmonds to intimidate him into ceasing and desisting the filing of grievances against KSP staff. It is this conflict with respect to motive that leads this Court to conclude that there remains a genuine dispute of material fact. Summary judgment would be inappropriate at this time.

### C. Fourth Amendment Violation

Plaintiff's first Complaint, [DN 1], was filed solely against Defendant Bower. There, Plaintiff seeks as relief both money and punitive damages, as well as injunctive relief in the form of enforcing "Bodily Privacy" rights against female correctional officers. The impetus of Plaintiff's claim against Bower stems from an incident on November 16, 2015 when Bower was handing out "canteen sheets" to inmates in Plaintiff's unit. Plaintiff avers that when Bower reached his cell, she looked inside while he was using the bathroom. Specifically, Plaintiff avers that he was shirtless and his pants were down around his ankles, and that he told Bower she was embarrassing him by watching him. According to Plaintiff, Bower left the area but returned later when Plaintiff again was using the bathroom. Plaintiff attempted to run out of view and slipped

and fell, injuring himself. Throughout the rest of that day, Plaintiff avers that Bower periodically looked into his cell while making her rounds in the unit.

"Neither the Supreme Court nor the Sixth Circuit has ever expressly recognized that the fourth amendment 'right to privacy' encompasses the right to shield one's naked body from view by members of the opposite sex." *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987). The Sixth Circuit "recognize[es] that a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners." *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992). "Couched in fourth amendment terms, the inquiry becomes whether plaintiff has a reasonable expectation of privacy from such 'searches.'" *Kent*, 821 F.2d at 1224, 1226 (finding a violation of the Fourth Amendment where "women guards were permitted and required to observe [the inmate] performing necessary bodily functions in his cell and while showering."). Conversely, in *Mills v. City of Barbourville*, 389 F.3d 568, 579 (6th Cir. 2004), the Sixth Circuit Court of Appeals found no violation when a correctional officer of the opposite sex accidentally viewed the inmate's naked body. The *Mills* Court went on to note that, "[i]f plaintiff can demonstrate that [defendant] planned or intended to see her during the search, he would not be entitled to qualified immunity." *Id.*

The District Court for the Eastern District of Michigan has had occasion to rule on this issue in a case bearing a striking resemblance to the one at hand. There, the plaintiff was a male inmate at the Michigan Maximum Correctional Facility in Standish Michigan, and the defendant was P. Schooler, a female correctional officer. *Tensley v. Alexander*, 822 F. Supp. 411, 412 (E.D. Mich. 1993). The plaintiff's claims involved occasions where the female correctional officer

would make her rounds and open his cell door window, looking in. *Id.* The plaintiff alleged that, when he was using the bathroom, she would linger for a longer period of time. *Id.* The court found as a matter of fact that there was "no establishment of the allegation that the defendant [correctional officer] unreasonably, unnecessarily or unconstitutionally observed this plaintiff. There may be a difference of opinion as to whether two seconds or three seconds was enough, or whether ten seconds was required…, but defendant was required to make the observation." *Id.* at 414. Further, "[t]hat was the prison policy," and observing plaintiff in his cell every 30 minutes was part of her responsibilities as a correctional officer. *Id.* The court then found "no invasion of plaintiff's privacy which would constitute a denial of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution," because it "was not done in such a manner or with such frequency or intent to unlawfully invade plaintiff's privacy rights, which are of course necessarily and appropriately limited and restricted in a prison setting." *Id.* at 415.

There are strong similarities between the facts of this case and *Tensley*. Indeed, Plaintiff's averments in this case largely mirror those of the plaintiff in *Tensley*: Plaintiff avers that Bower, while on duty and making rounds, repeatedly looked into his cell; on some of these occasions, Plaintiff happened to be using the bathroom. As Defendants correctly point out in their Motion for Summary Judgment, part of Bower's responsibilities as a correctional officer employed by the KY-DOC is to "mak[e] rounds and perform[] counts, which involves looking into inmate cells." [DN 137-3, at 11.] Plaintiff does not aver that Bower came into his cell, nor that she made lewd comments. Rather, Plaintiff's claim apparently rests on the fact that Bower was executing her professional responsibilities by handing out canteen sheets to inmates. Moreover, although Plaintiff attached to his first Complaint an affidavit from another inmate, Damien Sublett, this affidavit merely reinforces that fact. Specifically, Sublett avers that Bower was handing out

canteen sheets and that when she arrived at Plaintiff's cell, Sublett heard Plaintiff yell "I'm on the toilet." Sublett goes on to say that, in response to Plaintiff's exclamation, "Bower then walk off [sic]," and only returned to Plaintiff's cell thereafter to slide a canteen slip into his cell. While the Court is sensitive to individuals' rights with respect to their personal dignity, Plaintiff has simply failed to allege that Bower was doing anything other than her job and, to the extent that she saw Plaintiff in an unflattering position, this was merely incidental to the completion of her assignment. Because this claim fails as a matter of law, summary judgment is appropriate and the Court need not address the issue of whether Bower is entitled to qualified immunity.

### D. Conversion

Conversion is defined as the "wrongful exercise of dominion or control over property of another." *State Auto. Mut. Ins. Co. v. Chrysler Creditor Corp.*, 792 S.W.2d 626, 627 (Ky. Ct. App. 1990). In order to prevail on a claim for conversion in Kentucky, the plaintiff must prove the following seven elements:

> (1) The plaintiff has legal title to the converted property; (2) the plaintiff has possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act as legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damages by the loss of the property.

*Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632n.12 (Ky. 2005); *see also Meade v. Richardson Fuel, Inc.*, 166 S.W.3d 55, 58 (Ky. Ct. App. 2005).

Here, Plaintiff makes a claim for conversion only against Defendant Gibbs, an accountant at KSP. [*See* DN 12.] Plaintiff avers that on August 1, 2014, he received a monthly financial statement indicating that, at the beginning of July he had $1,114.99 in his inmate account, but at

the end of the month there was a balance of only $0.04. Plaintiff further avers that his account also showed no activity for that month, meaning that he had not spent any of the money himself. Thus, he avers that Gibbs converted this missing $1,114.95. Conversely, attached to Defendants' instant Motion is the account history of Plaintiff, which shows a balance of $0.04 on June 17, 2014 and a balance of $10.04 on August 12, 2014. [DN 137-54, at 2.]

The law requires that Plaintiff produce more than a scintilla of evidence pertaining to the alleged conversion of $1,114.95 from his inmate account. *See Hartsel*, 87 F.3d at 799. While Plaintiff makes a passing reference to it at the beginning of his Response, [DN 151, at 2], he merely says "Plaintiff's claims consist of a variety of things; ranging from theft of funds; excessive force etc." This is the only reference to the averments regarding Gibbs' alleged conversion of the money that Plaintiff argues was in his account at the beginning of July 2014. Plaintiff has attached no account statements showing this discrepancy in the same manner that Defendants have, nor has he provided any support for these averments. In short, Plaintiff has not shown (1) legal title to this money, (2) that he ever possessed it or it ever existed, (3) that Gibbs at any time exercised dominion or control over it in an intentional manner, nor that defendant's actions caused Plaintiff to lose this money. Bare allegations based on beliefs, accompanied by no evidence by the Plaintiff, are insufficient as a matter of law to withstand a motion for summary judgment. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (holding that plaintiff's "belief" that something occurred is not the same as personal knowledge that something occurred, and thus failed to satisfy Fed. R. Civ. P. 56(e)'s requirement of "personal knowledge."). Because this claim fails as a matter of law, summary judgment is appropriate and the Court need not address the issue of whether Gibbs is entitled to qualified immunity.

**E. First Amendment Freedom of Religion Claim**

Next, Plaintiff claims that his First Amendment Free Exercise Clause and Fourteenth Amendment Due Process and Equal Protection Clause rights were violated when Defendants White and Beavers refused to allow him to receive a copy of the Quran at KSP that had been ordered for him. It is axiomatic that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quotation marks omitted). Thus, while incarcerated, individuals "clearly retain protections afforded by the First Amendment," which includes "its directive that no law shall prohibit the free exercise of religion." *Id.*

However, of particular import to the instant case is the exhaustion of remedies. The Prison Litigation Reform Act ("PLRA") "provides that a prisoner may not bring an action under federal law related to prison conditions 'until such administrative remedies as are available are exhausted.'" *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011). And "[t]o exhaust his administrative remedies, a prisoner must adhere to the institutional grievance policy, including any time limitations." *Id.* The Sixth Circuit "requires an inmate to make 'affirmative efforts to comply with the administrative procedures,' and analyze whether those 'efforts to exhaust were sufficient under the circumstances.'" *Id.* (quoting *Napier v. Laurel Cnty., Kentucky*, 636 F.3d 218, 224 (6th Cir. 2011)). "Non-exhaustion is an affirmative defense under the PLRA." *Id.*

KSP has a detailed Inmate Grievance Policy, [DN 137-45], wherein inmates are provided with the policies and procedures for filing grievances. Specifically, inmates are instructed of what issues do and do not constitute "grievable" ones, policies for repetitious grievances, extensions for filing grievances, assistance with filing, how the grievance committee operates, and the steps necessary for an inmate to take in the grievance-filing process, among other regulations. Of note in the Inmate Grievance Policy is the following language: "A grievable issue

may include…Institutional policies and procedures." One of KSP's "Institutional policies," detailed in a December 30, 2015 memorandum by Defendant White, the Warden of KSP, is that "book orders may be placed only by the purchasing inmate. To place a book order the purchasing inmate shall…have sufficient funds available at the time of purchase," the inmate shall "sign a CPO and process the CPO through their assigned Classification and Treatment Officer," and must "order the book through a legitimate and verifiable publisher or vendor." [DN 137-11, at 4.]

In early 2016, Plaintiff attempted to have a Quran shipped to KSP but, consistent with the above-quoted policy, this article of mail was rejected. Plaintiff wrote to KSP's mail room, stating that "the Quran I ordered was purchased by me," and that "[t]he only way 2 receive anything from American Arab Message is to pay with stamps." [*Id.* at 2.] Defendant Beavers instructed Plaintiff in writing that, due to a lack of proof of purchase by Plaintiff and Plaintiff's failure to "sign a CPO and process the CPO through [Plaintiff's] assigned Classification and Treatment Officer," the Quran would not be given to Plaintiff. [*Id.* at 3.] Although Plaintiff wrote to the mail room regarding the rejection of the Quran, he apparently did not file any official grievance in accordance with Kentucky Corrections Policies and Procedures, and therefore failed to exhaust his administrative remedies. Defendants argue that this claim must be dismissed by the Court because of that fact. The Court agrees. Defendants' instant Motion contains extensive exhibits, two of which (Exhibits V & PP) provide photocopies of over 40 grievances Plaintiff has filed in his time at KSP. Thus, the Court is satisfied that Plaintiff is familiar with the processes and procedures of filing grievances and, with respect to the rejection of the Quran he ordered and the KSP policy at issue, Plaintiff was required to file such a grievance and otherwise exhaust any administrative remedy prior to filing a complaint in federal court.

Additionally, in Plaintiff's Response to Defendants' instant Motion, he does not reference Defendants' argument pertaining to his failure to exhaust his administrative remedies on this issue, nor does he mention the Quran at all. In spite of the fact that Plaintiff wrote to the mail room inquiring after the Quran and complained regarding its rejection, Plaintiff made no other "affirmative efforts to comply with the administrative procedures," leading this Court to conclude that his "efforts to exhaust were [in]sufficient under the circumstances." *See Napier*, 636 F.3d at 224. Because this claim fails as a matter of law, summary judgment is appropriate and the Court need not address the issue of whether White and Beavers are entitled to qualified immunity.

### F. Interference with Legal Mail

In his Third Amended Complaint, Plaintiff avers that Defendant Peek instructed Plaintiff that certain pieces of Plaintiff's legal mail must remain unsealed. Further, Plaintiff avers that, because of Peek's interference with his legal mail, Plaintiff has had to resort to the use of pseudonyms and other inmates to successfully forward his legal mail. Lastly, Plaintiff avers that he has given sealed legal mail to Peek to be mailed to the "Commonwealth Attorney General" and a criminal complaint to the Lyon County Circuit Court Clerk, but that he does not believe Peek mailed these documents because they were sealed.

The Sixth Circuit "has held that a prisoner has a fundamental interest in preserving the confidentiality of his legal mail." *Bell-Bey v. Williams*, 87 F.3d 832, 837 (6th Cir. 1996). Therefore, when prison policies regulate incoming and outgoing legal mail, "an important or substantial governmental interest unrelated to the suppression of expression" must exist, and cannot limit inmates' First Amendment freedoms any more than necessary to protect that

governmental interest. *Procunier v. Martinez*, 416 U.S. 396 (1974). However, it need not be the least restrictive means available. *See Thornburgh v. Abbott*, 490 U.S. 401, 411 (1989).

In Defendants' instant Motion, their primary contention is that Plaintiff has not exhausted his administrative remedies. As noted above, the failure of a plaintiff to exhaust his administrative remedies within the prison is an affirmative defense. *See Grinter v. Knight*, 5332 F.3d 567, 578 (6th Cir. 2008). And while a plaintiff is not required to affirmatively demonstrate that he has exhausted all of his administrative remedies, something Plaintiff has not done in this case, it is incumbent upon the defendant to assert this defense and bear the initial burden of proof. *See Bruce v. Corr. Med. Servs., Inc.*, 389 F. App'x 462, 467 (6th Cir. 2010).

Exhibits V and PP to Defendants' instant Motion chronicle over 40 grievances Plaintiff has filed in his time at KSP. However, with respect to the interference with his legal mail, there is only one grievance included there that references his allegations that Peek forced him to leave such mail "unsealed." This is Grievance Number 17-02-086-6. [DN 137-46, at 89.] Importantly, this grievance does not mention Peek, instead naming a "CTO Mitchell," and references an incident which occurred on February 13, 2017. This is crucial due to the fact that Plaintiff lists in the "supplement" to his Third Amended Complaint, [DN 48], specific dates when Peek allegedly interfered with his legal mail, requiring that it be left unsealed. By Plaintiff's own averments these dates are July 25, 2016; August, 7, 2016; August 19, 2016; August 22, 2016; and August 25, 2016. The latest of these dates is still roughly six months prior to the grievance Plaintiff filed alleging that he was forced to keep his legal mail unsealed. And again, this singular grievance covering the issue does not mention Peek. Defendants have affirmatively defended their position that, with respect to the interference with legal mail claim against Peek, Plaintiff has not exhausted his administrative remedies. Because this claim fails as a matter of law, summary

judgment is appropriate and the Court need not address the issue of whether Peek is entitled to qualified immunity.

## IV. Qualified Immunity

Defendants also claim that they are entitled to qualified immunity on Plaintiff's numerous claims against them. Because the Court has already determined that Defendants are entitled to summary judgment on some of Plaintiff's claims, above, the Court will only examine Defendants' qualified immunity claims as they pertain to Plaintiff's surviving claims.

Pursuant to the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The question of whether qualified immunity is available to a defendant involves a two-step process: "[f]irst, the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred." *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002). Then, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194 (2001). In order for a law to be deemed as "clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Bell*, 308 F.3d at 602. In other words, "the unlawfulness [of the action] must be apparent." *Id.*

Plaintiff has First Amendment retaliation claims remaining against Grief, Hawkins, Belt, Fraliex, Coombs, Edmonds, Henson, McLeod, and Heggen. And taking Plaintiff's averments from his Complaint and three Amended Complaints as true, a constitutional violation has

occurred. Specifically, as explained in greater detail above, Plaintiff has averred that these Defendants expressly made known their retaliatory intentions in taking adverse actions against Plaintiff, ranging from cell shakedowns to physical altercations, stealing Plaintiff's personal effects, spitting in his food, overt threats of letting Plaintiff "rot" in a restrictive unit, and standing by as Plaintiff was beaten by another inmate. Moreover, taking Plaintiff's version of events as true, Defendants not only engaged in this conduct, but actually told Plaintiff *why* they were doing it, that is, in retaliation for Plaintiff filing grievances and/or lawsuits against KSP staff.

The second stage of the qualified immunity analysis asks whether the right at issue was clearly established. As explained by the Sixth Circuit, a defendant's "First Amendment right of free speech [is] 'clearly established' for qualified immunity purposes." *Zilich v. Longo*, 34 F.3d 359, 364 (6th Cir. 1994). Indeed, "[t]he law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional, and 'retaliation claims' have been asserted in various factual scenarios." *Id.* at 365. Thus, "[n]o reasonable official could possibly believe that it is constitutionally permissible to retaliate against a [prisoner] with physical threats, harassments and vandalism." *Id.* Grief, Hawkins, Belt, Fraliex, Coombs, Edmonds, Henson, McLeod, and Heggen are not entitled to qualified immunity on Plaintiff's First Amendment retaliation claims.

Plaintiff's remaining claims are against Belt, Coombs and Edmonds under the Eighth Amendment's prohibition of cruel and unusual punishments. Plaintiff avers that Belt violated his Eighth Amendment rights when he took part in the physical restraint of Plaintiff, which he avers involved beating him and tazing him. Plaintiff avers that Coombs and Edmonds inflicted cruel and unusual punishment against him by grabbing him while conducting shakedowns of his cell.

"Whether [their] alleged conduct constituted excessive force in violation of the Eighth Amendment depends on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). Plaintiff's allegations, when taken as true, would constitute a violation of the Eighth Amendment; the beating, if true, would certainly be construed as the sadistic and unnecessary infliction of cruel and unusual punishment, and grabbing someone's arm, even where the injury inflicted is *de minimis*, contravenes the Eighth Amendment when done maliciously under the subjective component of the Eighth Amendment inquiry, discussed above.

The Court is also satisfied that, when taken as true, the Plaintiff's claims regarding Belt, Coombs, and Edmonds tend to show that the officers were "on notice that their conduct violate[d] established law...." *See Hope v. Pelzer*, 536 U.S. 730, 731 (2002). With respect to Coombs and Edmonds, Plaintiff avers that they made their unlawful intent known when they grabbed Plaintiff, expressly telling him to cease engaging in the protected activity of filing grievances and lawsuits. Regarding Belt, Plaintiff argues that he was beaten and tazed while being transferred, actions Belt would be notice of with respect to implicating the Eighth Amendment. As such, none of these three defendants are entitled to qualified immunity on the Eighth Amendment claims against them.

## V. CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED AS FOLLOWS:**

1) Defendants' Motion for Summary Judgment [DN 137] as to Plaintiff's claims of retaliation against Defendants Bower, Myers, Robertson, Cranor, Von Dwingelo, and Bauer is **GRANTED.**

2) Defendants' Motion for Summary Judgment [DN 137] as to Plaintiff's claims of retaliation against Defendants Belt, Grief, Hawkins, Fraliex, Coombs, Edmonds, Henson, McLeod, and Heggen is **DENIED.**

3) Defendants' Motion for Summary Judgment [DN 137] as to Plaintiff's Eighth Amendment excessive use of force claims against Defendants Belt, Coombs and Edmonds is **DENIED.**

4) Defendants' Motion for Summary Judgment [DN 137] as to Plaintiff's Fourth Amendment claim against Defendant Bower is **GRANTED.**

5) Defendants' Motion for Summary Judgment [DN 137] as to Plaintiff's conversion claim against Defendant Gibbs is **GRANTED.**

6) Defendants' Motion for Summary Judgment [DN 137] as to Plaintiff's First Amendment Free Exercise claim against Defendants White and Beavers is **GRANTED.**

7) Defendants' Motion for Summary Judgment [DN 137] as to Plaintiff's interference with legal mail claim against Defendant Peek is **GRANTED.**

The Clerk is directed to remove the following defendants from the case: Sojnia Bower, Joy Myers, Jill Robertson, Larry Cranor, Bruce Von Dwingelo, Tami Bauer, Lisa Gibbs, James Beavers, Randy White, and Marshall Peek.

**IT IS SO ORDERED.**

cc:    Michael Cooper, #211158, *Pro se* Plaintiff
Kentucky State Penitentiary
266 Water St.
Eddyville, KY 42038

cc:    Counsel of record